# NO. 12-20-00106-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *PETROCHOICE HOLDINGS, LLC &* *PETROCHOICE HOLDINGS, INC.,* *APPELLANTS* | § | *APPEAL FROM THE 402ND* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *MARY PEARCE,* *APPELLEE* | § | *WOOD COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

PetroChoice Holdings, LLC and PetroChoice Holdings, Inc. (PetroChoice unless separately demarcated) appeals the trial court's summary judgment order in favor of Mary Pearce. PetroChoice raises three issues on appeal. We reverse and remand.

## BACKGROUND

From 2000 to 2016, Universal Lubricants employed Pearce as a salesperson in the industrial lubricant industry. Her job required her to travel, maintain customer relationships, and sell lubrication products to Universal's customers in her territory, which consisted of large portions of Texas, Northern Louisiana, and part of Mississippi. In April 2016, PetroChoice acquired Universal Lubricants.[1] Pearce received an email of the acquisition containing a mandatory meeting notice at PetroChoice's warehouse in Dallas, Texas. PetroChoice extended an offer of at-will employment to some Universal employees such as Pearce. As a condition of employment, PetroChoice required Pearce to sign an employment agreement containing, among other items, a noncompetition covenant and confidentiality agreement. According to Pearce, she

---

[1] Pearce understood that either PetroChoice Holdings, LLC or PetroChoice Holdings, Inc. acquired Universal Lubricants. The record as it is currently developed does not definitively establish which entity acquired Universal and employed Pearce.

wanted time to review the agreement, but was told that she must sign the agreement or be immediately terminated. Pearce reluctantly signed the agreement.

On October 12, 2018, Pearce attended another mandatory meeting at PetroChoice's warehouse. At the meeting, she was terminated. Pearce began looking for work in the industrial lubricant industry, but had difficulty obtaining employment because of her PetroChoice noncompetition agreement. However, SB Fleet – Lube, LLC, learned that she had been terminated at PetroChoice. Fleet Lube owner Lisle Budden called Pearce to set up a meeting to discuss the matter. Pearce described Fleet Lube as a customer she worked with while employed at PetroChoice. Pearce began working at Fleet Lube on January 2, 2019.

Prior to accepting employment at Fleet Lube, Pearce filed the instant suit in Wood County, Texas on November 8, 2018.[2] In her petition, Pearce sought a declaration that the covenant not to compete was unenforceable because at no point did PetroChoice provide any consideration in exchange for its execution. Pearce also alleged that the covenant was unreasonable as to the geographic territory covered by the agreement. PetroChoice Holdings, LLC subsequently filed an answer and counterclaim denying Pearce's allegations and claiming that Pearce, in violation of their agreement, became employed by Fleet Lube, which it alleged is a PetroChoice competitor. PetroChoice also alleged that she possessed and used its confidential information, along with allegations that she improperly solicited its clients, interfered with those relationships, and conducted business with its clients in violation of their noncompetition covenant.

During this litigation, PetroChoice Holdings, Inc. filed a separate claim against Pearce in Wood County. After its efforts to obtain a temporary restraining order (TRO) to temporarily enforce the agreement were unsuccessful, it nonsuited its claim against Pearce and filed suit against Fleet Lube in Collin County. It also joined Pearce as a defendant in the Collin County litigation, alleging the same claims against her as in its earlier nonsuited Wood County claim. After successfully obtaining an ex parte TRO temporarily enforcing the agreement in Collin County, it settled its claim with Fleet Lube, the terms of which included that Fleet Lube terminate Pearce's employment, and nonsuited the claim against Pearce. PetroChoice Holdings, Inc. then filed a counterclaim against Pearce in her original declaratory judgment action against

---

[2] Pearce filed suit in Wood County pursuant to a clause in her PetroChoice employment agreement requiring that disputes arising from the agreement be litigated there.

it and PetroChoice Holdings, LLC.  The basis for the counterclaim was the same as PetroChoice Holdings, LLC's earlier counterclaim, Petrochoice Holdings, Inc.'s nonsuited Wood County suit, and its Collin County suit against Pearce.  Based on this perceived forum shopping, Pearce filed a motion for sanctions under Chapter 10 of the Texas Civil Practice and Remedies Code.  The trial court ordered that PetroChoice pay Pearce a total of $18,231.67 as sanctions.  The trial court recited in its order that the purpose of the sanction was to reimburse Pearce for expenses incurred against PetroChoice's "abuse of the judicial process designed and employed in an attempt to place [Pearce] in a financial stranglehold in hopes that she would eventually become financially unable to continue to pursue her remedies and continue litigation."

Thereafter, the parties filed competing motions for summary judgment regarding the enforceability of the employment agreement's noncompetition covenant.  Pearce contended that the agreement was unenforceable because PetroChoice failed to provide consideration for its execution and that the agreement's geographic limitation was unreasonable.  Conversely, PetroChoice contended that the agreement was enforceable because it provided Pearce confidential information and training and that the agreement's geographic limitations were reasonable.  The trial court granted Pearce's motion and denied PetroChoice's motion.  Pearce also filed a motion for costs and attorney's fees, which the trial court granted in the amount of $53,362.50 through trial, as well as contingent appellate attorney's fees.  Having disposed of all parties and all issues, the trial court signed a final judgment and this appeal followed.

### SCOPE OF SUMMARY JUDGMENT ISSUES CONSIDERED ON APPEAL

In Pearce's brief, she contends that the trial court properly granted summary judgment in part because PetroChoice materially altered the agreement by changing the identity of the parties.  Specifically, Pearce argues that "PetroChoice Holdings, LLC" was the party that executed the agreement.  After the agreement's execution, PetroChoice representatives drew a line through that name, replaced it with "PetroChoice Holdings, Inc.," and initialed the change.  Pearce argues that this is a material change to the agreement that renders it null and void.

With respect to this argument, we note that this ground was not presented to the trial court in support of Pearce's motion for summary judgment or in opposition to PetroChoice's competing motion for summary judgment.  All theories in support of or in opposition to a motion for summary judgment must be presented in writing to the trial court.  *See* TEX. R. CIV. P.

166a(c). A motion for summary judgment must itself expressly present the grounds upon which it is made, and must stand or fall on these grounds alone. *See id.*; *Science Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 912 (Tex. 1997). A court cannot grant summary judgment on grounds that were not presented. *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 204 (Tex. 2002). This court can only address grounds for summary judgment that were raised in writing in the trial court. *See* TEX. R. CIV. P. 166a(c); *Kaye/Bassman Intern. Corp. v. Help Desk Now, Inc.*, 321 S.W.3d 806, 818 (Tex. App.—Dallas 2010, pet. denied); *Hackberry Creek Country Club, Inc. v. Hackberry Creek Home Owners Ass'n*, 205 S.W.3d 46, 50 (Tex. App.—Dallas 2006, pet. denied). In determining whether the grounds are expressly presented, we look only to the motion itself; we do not rely on briefs or summary judgment evidence. *Science Spectrum, Inc.*, 941 S.W.2d at 912.

Pearce did not advance the argument that PetroChoice materially altered the employment agreement in her motion for summary judgment or in response to PetroChoice's competing motion for summary judgment. Because the trial court cannot grant a motion for summary judgment on grounds not presented in the motion or in opposition thereto, we cannot consider this ground for the affirmance of the trial court's summary judgment. *See* TEX. R. CIV. P. 166a(c); *Johnson*, 73 S.W.3d at 204; *Science Spectrum, Inc.*, 941 S.W.2d at 912; *Kaye/Bassman Intern. Corp.*, 321 S.W.3d at 818; *Hackberry Creek Country Club, Inc.*, 205 S.W.3d at 50.

## SUMMARY JUDGMENT – COVENANT NOT TO COMPETE

PetroChoice contends in its first issue that the trial court erred in granting summary judgment in Pearce's favor, because the employment agreement containing the noncompetition covenant is enforceable as a matter of law, or alternatively, that underlying factual issues remain unresolved.

### Standard of Review

The movant for traditional summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See* TEX. R. CIV. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex. 1985). When reviewing traditional summary judgments, we perform a de novo review of the record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts

against the motion. *See Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006); *KPMG Peat Marwick v. Harrison Cty. Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999).

When, as here, competing motions for summary judgment are filed, each party bears the burden of establishing that it is entitled to judgment as a matter of law. *Tarr v. Timberwood Park Owners Ass'n*, 556 S.W.3d 274, 278–79 (Tex. 2018). When the trial court grants one motion and denies the other, we review the summary judgment evidence presented by both sides, determine all questions presented, and may reverse the trial court's judgment and render such judgment as the trial court should have rendered, including rendering judgment for the other movant. *See Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). If, however, a genuine fact issue exists, summary judgment for either party is inappropriate, and we reverse and remand. *McCreight v. City of Cleburne*, 940 S.W.2d 285, 288 (Tex. App.—Waco 1997, pet. denied). A fact issue may be created either by disputed or ambiguous facts. *Id.*

**Applicable Law**

The enforceability of a covenant not to compete agreement is a question of law. *Powerhouse Prods., Inc. v. Scott*, 260 S.W.3d 693, 696 (Tex. App.—Dallas 2008, no pet.); *see also Gorman v. CCS Midstream Servs., L.L.C.*, No. 12–09–00204–CV, 2011 WL 1642624, at *3 (Tex. App.—Tyler 2011, no pet.) (mem. op.). Likewise, what constitutes sufficient consideration for a contract is generally a question of law, but can be a question of fact. *Roark v. Stallworth Oil and Gas, Inc.*, 813 S.W.2d 492, 496 (Tex. 1991) (holding factual questions remained on consideration issue in summary judgment case due to failure to produce conclusive proof); *Burges v. Mosley*, 304 S.W.3d 623, 629 (Tex. App.—Tyler 2010, no pet.) (question of law).

A covenant not to compete is enforceable if it is (1) ancillary to or part of an otherwise enforceable agreement at the time the agreement is made and (2) reasonable, not imposing a greater restraint than is necessary to protect the goodwill or other business interest of the employer. *See* TEX. BUS. & COM. CODE ANN. § 15.50(a) (West 2011). The first element can be broken down into two inquiries: (1) whether there is an "otherwise enforceable agreement," and (2) whether the covenant not to compete is "ancillary to or part of" that agreement at the time the otherwise enforceable agreement was made. *See Mann Frankfort*, 289 S.W.3d at 849.

With regard to the first inquiry, "otherwise enforceable agreements" can emanate from at-will employment so long as the consideration for any promise is not illusory. *Id.* Moreover, a unilateral contract formed when an employer performs a promise that was illusory when the contract was formed can satisfy the requirements of the statute. *See Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 651 (Tex. 2006). Thus, when an employer makes an illusory promise of consideration and, later, performs in accord with the promise, the consideration is no longer illusory. *See id.* Additionally, even in the absence of an express promise to provide confidential information, when the nature of the employee's work requires confidential information to be provided for him to perform the work, the employer impliedly promises the information will be provided. *See Mann Frankfort*, 289 S.W.3d at 850.

Concerning the second inquiry, for a covenant not to compete to be "ancillary to or part of" an otherwise enforceable agreement, the employer must establish both that (a) the consideration given by the employer in the agreement is reasonably related to an interest worthy of protection and (b) the covenant not to compete was designed to enforce the employee's consideration or return promise in the agreement. *See Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 775 (Tex. 2011). "The covenant cannot be a stand-alone promise from the employee lacking any new consideration from the employer." *Sheshunoff*, 209 S.W.3d at 651. The consideration from the employer "must give rise to the employer's interest in restraining the employee from competing." *Id.* at 648–49. Business goodwill, confidential or proprietary information, trade secrets, customer information, and specialized training are examples of interests that can be, in appropriate circumstances, worthy of protection by a covenant not to compete. *See, e.g., Marsh USA Inc.*, 354 S.W.3d at 777; *Sheshunoff*, 209 S.W.3d at 651; *Neurodiagnostic Tex, L.L.C. v. Pierce*, 506 S.W.3d 153, 163–64 (Tex. App.—Tyler 2016, no pet.).

## Discussion

Pearce contended in her motion for summary judgment and supporting affidavits that PetroChoice never promised or actually furnished her with any confidential information or training that would satisfy the "ancillary to or part of an otherwise enforceable agreement" requirement sufficient to render the agreement enforceable. PetroChoice argued in its competing motion that her former supervisor established in his affidavit that the company provided confidential information and training to Pearce after she began her employment there, and that in

6

any event, Pearce admitted she received such confidential information from PetroChoice in her deposition, rendering the agreement enforceable.

Pearce explained in her initial affidavit that PetroChoice did not furnish her an office, that she worked mainly in her automobile, traveled to visit her customers, maintained a home office, and had a cell phone and company issued iPad. Pearce stated that PetroChoice never furnished her a lead about a new customer, and that all customers developed while working for PetroChoice were based entirely on her efforts, most of which came to her by referrals from other customers. Pearce continued that PetroChoice did not furnish her any confidential information, and that it was unnecessary to do her job, because she had worked in the lubricant business for more than thirty years. She stated that she could go online to obtain names of potential customers, which she had done on a regular basis. She further explained that she neither needed nor received any assistance from PetroChoice in that regard, and that she developed her sales contacts on her own. Finally, she explained that when she was terminated, she surrendered her phone that contained the names and contact information for customers that she serviced for many years while working at Universal and PetroChoice, and that she shipped all material back to PetroChoice, including her iPad and any documents or sales material she possessed at the time of her termination. Pearce clarified in her deposition that she only had a customer list of the customers she serviced while working for PetroChoice, many of whom she had developed prior to PetroChoice's acquisition of Universal. She testified that she did not have a master list of PetroChoice's customers or access to a company computer containing such information, and that any information she received from PetroChoice was not confidential but was instead available to the general public.

In response to Pearce's motion, PetroChoice relied on an affidavit from Rick Palmore, PetroChoice's former Western Regional Vice President and Pearce's supervisor, along with admissions by Pearce as to certain confidential information she held. The entirety of the relevant portion of the affidavit stated only as follows:

> Specifically, during her employment with PetroChoice, PetroChoice provided Pearce access to PetroChoice's confidential information including, among other things, names of PetroChoice's clients, client contact and decision maker information, pricing information, profit margins, sales volume and history, types and amounts of products purchased, terms and conditions of contracts, accounts receivable information, and whether PetroChoice's clients had bulk storage equipment on loan and the terms of the arrangements. PetroChoice also provided Pearce access to confidential information concerning PetroChoice's products including chemical analyses and comparisons of

PetroChoice's products with competitors' products. Further, PetroChoice provided Pearce with sales training including PetroChoice's proprietary methods for competing with other distributors.

Palmore's affidavit was unaccompanied by any other facts or evidence explaining the factually conclusory laundry list of alleged confidential information. *See* TEX. R. CIV. P. 166a(f); ***Atmos Energy Corp. v. Paul***, 598 S.W.3d 431, 467-68 (Tex. App.—Fort Worth 2020, no pet.) (party's summary judgment affidavit containing unexplained factually conclusory statements held insufficient on appeal); ***Miner, Ltd. v. Anguiano***, 383 F. Supp. 3d 682, 698 (W.D. Tex. 2019) (finding similar laundry list recitation of confidential information allegedly provided to former employee, unaccompanied by further explanation or proof, insufficient under Texas law to establish enforceability of noncompetition covenant for purposes of preliminary injunction).

Other than Palmore's affidavit, PetroChoice relied on statements in Pearce's deposition wherein she made certain admissions concerning the nature of the information she received while at PetroChoice. Specifically, the following exchange took place:

Q. Okay. The information that we've just talked about, we've talked about client names, addresses, product information, we've talked about the names of the people that you dealt with and their phone numbers that were in your cell phone, we've talked about quarterly reports that had total sales information, gallons, margins, reserve price list. With respect to that information, when you were at PetroChoice, were you free to share that information with PetroChoice's competitors?
A. No.
Q. Did it — would you have thought that would have been an appropriate thing to do?
A. No.
Q. I assume Fleet-Lube has similar information like that pertaining to its customers?
A. As far as pricing?
Q. Well, just all the stuff that a company would have; names of clients, client contact information, product information, sales history, sales volume, pricing, margins, Fleet-Lube has to have all that, too, right?
A. Sure.
Q. And I assume that you wouldn't think it would be appropriate to share that with a Fleet-Lube competitor, would it?
A. Correct.

. . . .

Q. Okay. That's all I was trying to get you to say. So, some of the information we just discussed is confidential.
A. Sure.
Q. Tell me what that would be.
A. The sales volume, pricing.
Q. Sure. What about contact person, who to call?
A. No. It's public knowledge.
Q. Okay. Total — okay. Sales volume, pricing. Okay. Am I right in thinking that sales volume and pricing information with respect to clients changed over time, right? In other words, you might look in the beginning of 2019 and see a number on sales volume, but then you might look at

8

the end of 2019 — I'm sorry, 2018 — the beginning of 2018 and see a number and sales volume, then you look at the end of 2018 and see a different number, right? It would change over time.
A. Yes.
Q. And I assume pricing would, too. It has to change a lot, right? A lot of fluctuation on the price of oil and lubricants, and so forth. Am I right about that?
A. Yes.

Prior to the summary judgment hearing, Pearce filed a motion for leave to file a supplemental affidavit, which the trial court granted. The purpose of the supplemental affidavit was to (1) further expound upon her prior affidavit alleging that she received no confidential information from PetroChoice, (2) explain her admissions in her deposition testimony, and (3) rebut the alleged confidential information Palmore stated that PetroChoice provided in his affidavit.[3] For example, she explained in her supplemental affidavit that even though she admitted some of the information was confidential, it was actually her that provided the information to PetroChoice. In relevant part, Pearce stated in her supplemental affidavit as follows:

> At the time I was forced to sign the Employment Contract with PetroChoice Holdings, LLC/Inc., I was promised nothing except what I was already entitled to receive. When Rick Palmore says that while I was at PetroChoice I was provided confidential information, the truth is that I was furnished no confidential information that I had not received for the past 16 years. PetroChoice never furnished me with any training, specialized or otherwise, that taught me how to sell the same products I had been selling for the past 16 years. PetroChoice continued to sell Universal's products with Universal's logo on them. An example is shown on Exhibit "A" attached hereto. All of their products continued to bear the Universal name and logo until around May of 2018. PetroChoice never came to me and said we have a new product that you are going to be selling for us. Nothing like that ever happened. I sold the same products and services I had been selling for 16 years. In fact, Rick Palmore told me that PetroChoice wanted to learn our way (Universal's) of selling because of our success with customer retention and overall market success.
> Insofar as sales volume is concerned, that is confidential but that was furnished by me to PetroChoice and not the other way around. Product pricing is something that every salesperson is given on a regular basis. Universal and PetroChoice would tell their salesperson what prices they could quote. That is standard in the industry. It is nothing unusual and product pricing continued

---

[3] PetroChoice did not provide argument or authorities in its appellate brief that Pearce's affidavit violated the "sham affidavit" rule. It did make that argument in the trial court and briefly at oral argument. Under the sham affidavit rule, if a party submits an affidavit that conflicts with the affiant's prior sworn testimony and does not provide a sufficient explanation for the conflict, a trial court may disregard the affidavit when deciding whether the party has raised a genuine fact issue to avoid summary judgment. *See Lujan v. Navistar, Inc.*, 555 S.W.3d 79, 82 (Tex. 2018). Here, Pearce filed the supplemental affidavit to establish her own right to summary judgment, not only to avoid a competing motion for summary judgment. To the extent that her supplemental affidavit can be viewed in the context of opposing PetroChoice's competing motion for summary judgment, we hold that, as we have described, the affidavit is not in direct conflict with her deposition testimony. Rather, the supplemental affidavit further expounds upon her statements in her earlier affidavit that PetroChoice did not provide her any confidential information or training. It was also made in response to the conclusory assertions in Palmore's affidavit concerning the nature and extent of any confidential information PetroChoice allegedly provided to her. Accordingly, we hold that Pearce's supplemental affidavit does not violate the "sham affidavit" rule. *See id.*

as it had been for 16 years before I was forced to sign the Employment Agreement with PetroChoice.

Pearce also stated elsewhere in her deposition that her employment at Fleet Lube would violate the covenant based on the language used in the agreement. However, when understood in context, she contended that the covenant was unenforceable, and that it was thus irrelevant whether she violated the technical language in the agreement.

PetroChoice relies on *McKissock, LLC v. Martin*, where a continuing education course provider for real estate professionals sought to enforce a noncompetition agreement against one of its former employees. *See* 267 F. Supp. 3d 841, 846-48 (W.D. Tex. 2016). The former employee argued that her former employer did not provide her with any confidential information. *See id.* at 853-54. Despite the parties' dispute concerning whether the company actually provided any information that was confidential, the federal district court granted a preliminary injunction in the employer's favor. *See id.*

Conversely, with respect to whether PetroChoice provided confidential information, other similar cases have different results than *McKissock*. *See, e.g., Miner, Ltd. v. Anguiano*, 383 F. Supp. 3d 682, 698 (W.D. Tex. 2019). In *Miner*, the employer was in the business of selling, installing, and servicing material handling equipment and loading dock products. *Id.* at 689. The company alleged that its former employee, a high-ranking account executive, possessed confidential information required for the work to be performed. *Id.* at 688-89. Texas courts have acknowledged that various types of consideration such as confidential information can, *in appropriate circumstances*, satisfy the "ancillary to or part of" element to constitute an interest worthy of protection. *See, e.g., Neurodiagnostic Tex*, 506 S.W.3d at 164. In *Miner*, the federal district court examined the record and concluded as follows:

> Plaintiff has not persuaded this court that this case involved the dissemination of "confidential information." In *DeSantis v. Wackenhut Corporation*, the Texas Supreme Court rejected the plaintiff's claim that its supposed confidential information—the identity of their customers, pricing policies, cost factors, and bidding strategies—was protectable under the confidentiality agreement. It explained that the plaintiff "failed to show that its customers could not readily be identified by someone outside its employ, that such knowledge carried some competitive advantage, or that its customers' needs could not be ascertained simply by inquiry addressed to those customers themselves." Additionally, the Texas Supreme Court noted the plaintiff "failed to show that its pricing policies and bidding strategies were uniquely developed, or that information about its prices and bids could not, again, be obtained from the customers themselves."
> Like *Wackenhut*, Plaintiff has not shown its business practices, pricing, margin, or strategy were uniquely developed or not readily accessible. Furthermore, Plaintiff's alleged

> "confidential information" is vague at best. Plaintiff struggles to identify and expand upon the alleged confidential information. The court will not infer a fact into existence. The Employment Agreement lacks consideration and is unenforceable.

***Miner***, 383 F. Supp. 3d at 698 (internal citations omitted). Palmore's affidavit contains a similar level of detail as the evidence in ***Miner***.

In any event, ***McKissock*** and ***Miner*** are preliminary injunction cases, where the chief issue is whether temporary enforcement of the agreement pending resolution of the matter at trial is necessary to prevent irreparable injury in the face of a substantial probability of recovery. *See **Miner***, 383 F. Supp. 3d at 698; *see also **McKissock***, 267 F. Supp. 3d at 853-54. That is distinct from the procedural posture and issue presented here, namely whether the record as it is currently developed conclusively establishes the covenant's (un)enforceability for the purpose of rendering a full and final summary judgment without the need to resolve fact issues at trial.

A more procedurally and factually analogous case comes from one of this Court's prior opinions. *See generally **Gorman v. CCS Midstream Services, L.L.C.***, No. 12-09-00204-CV, 2011 WL 1642624, at *1 (Tex. App.—Tyler Apr. 29, 2011, no pet.) (mem. op.). There, Gorman worked for Mobley, a company eventually acquired by CCS, which was in the business of transporting, managing, and disposing of oilfield fluids and liquids. *Id.* at *1. CCS acquired Mobley because it had specific expertise in an area in which CCS sought to expand. *Id.* During the acquisition, it offered certain high-level employees such as Gorman a written at-will employment agreement that contained a noncompetition covenant. *Id.* Although Gorman signed the agreement, CCS began to diminish Gorman's responsibilities. *Id.* Dissatisfied, Gorman resigned and became employed by a CCS competitor. *Id.* CCS filed suit to enforce the covenant and obtained a TRO and a temporary injunction. *Id.* at *1-2. CCS then filed a motion for summary judgment, alleging that the record conclusively showed that it provided Gorman confidential information, which the trial court granted. *Id.* at *2.

We reversed and remanded the suit because Gorman's evidence raised a fact issue as to whether CCS actually provided the consideration in the form of confidential information that was reasonably related to an interest worthy of protection.[4] *Id.* at *8. On the one hand, CCS

---

[4] Although Gorman contended that the covenant was enforceable as a matter of law on appeal, he did not file a competing motion for summary judgment, and we noted that, even if Gorman had established that the covenant was not enforceable as a matter of law, we could at most remand the proceeding. *See **Gorman***, 2011 WL 1642624, at *8-9. In any event, we held that factual issues remained. *See id.*

pointed to evidence that Gorman admitted in his deposition that he received various pieces of confidential information, including pricing information and other financial information. *Id.* at *4-5. On the other hand, Gorman produced deposition testimony from Robert Miracle, Gorman's supervisor at both Mobley and CCS. *Id.* at *5. Miracle admitted that CCS acquired Mobley and its valuable employees because of their preexisting expertise in an area that CCS lacked. *Id.* at *5. Miracle testified that Gorman had knowledge of CCS's financial statements that detailed its expenses, and each category of expense makes up a percentage of the total operating cost, which is then used to formulate the bid based on the acceptable profit margin. *Id.* He testified that Gorman's knowledge of this information would have given him and his new employer a competitive advantage in formulating bids against CCS. *Id.* at *5-6. He stated that the actual dollar amount of the expenses fluctuated, but the percentages and margins remained the same. *Id.* at *6. However, Miracle admitted that Gorman acquired this knowledge at Mobley, and that it largely remained the same after CCS acquired Mobley. *See id.* Both parties disagreed as to whether the evidence established the enforceability of the covenant as a matter of law, but we held that this conflicting evidence raised a fact issue. *See id.* at *8.

Here, as in the similarly situated parties in *Gorman*, PetroChoice acquired Universal. PetroChoice admits that the purpose of the purchase was at least in part to acquire Universal's goodwill and customers it had accumulated. Pearce also provided evidence consistent with this purpose. For example, PetroChoice claimed that it provided her with training, but Pearce pointed to emails from Palmore and other high-level PetroChoice employees after the acquisition showing that they treated her as the "expert in Lifelines applications and would be the best person to talk to," they were presenting the program "and don't have a complete understanding of the entire program . . ., [that they would] love to pick [Pearce's] brain, . . . [and] would like to get [her] in front of a handful of key prospects, [secure the program, and provide some] demo training." The e-mail communication chain continued, saying that Pearce would provide a "mentoring role" at the training as "best in class." In other words, this evidence tends to show that Pearce was the former Universal employee providing the knowledge and training to PetroChoice employees after the acquisition.

PetroChoice points to the Texas Supreme Court's statement that "[t]he enforceability of the covenant should not be decided on 'overly technical disputes' of defining whether the covenant is ancillary to an agreement." *See Marsh USA Inc.*, 354 S.W.3d at 777. However,

given the procedural posture of this case at this juncture, we note that it must still establish its entitlement to summary judgment on the covenant's enforceability, of which this inquiry is a component. Palmore's conclusory affidavit does little to negate Pearce's evidence that PetroChoice provided her no new information that she did not already know prior to its acquisition of Universal.

But this does not end our inquiry. In Pearce's deposition, she admitted that the "sales volume" and "pricing" were confidential. She explained in her supplemental affidavit that she provided the "sales volume" information to PetroChoice, which is consistent with the evidence that PetroChoice acquired Universal due to its customer base and goodwill. And it was Pearce who either serviced the same Universal clients as she had over the past several years or developed new clients herself while at PetroChoice after the acquisition.

With respect to "pricing" though, the evidence is ambiguous. She admitted in her deposition that the "pricing" information was confidential as in *Gorman*. In her supplemental affidavit though, Pearce claimed that PetroChoice provides pricing information to her, just as it does to every salesperson on a regular basis, which, according to her, is an industry standard. She stated that Universal and PetroChoice would tell the salesperson what prices they could quote to a customer, but that product pricing is the same as it had been for the prior sixteen years before her employment at PetroChoice. Pearce admitted in her deposition that "pricing" fluctuated. Therefore, at least as to "pricing," the facts are ambiguous, and she failed to conclusively establish that PetroChoice did not provide her with that information that she admitted was confidential.

On the other hand, PetroChoice provided no evidence showing how its "pricing" is reasonably related to an interest worthy of protection. Pearce stated generally that this information was consistent over time and that PetroChoice did not really provide her with information she did not already possess prior to signing the agreement, but in her deposition, Pearce admitted that "pricing" fluctuated over time. PetroChoice failed to explain the nature of its pricing structure or otherwise show that "pricing" was actually "confidential" and an interest worthy of protection as those terms are used in the covenant not to compete context. For example, in *DeSantis*, the Texas Supreme Court explained that the employer "failed to show that its customers could not readily be identified by someone outside its employ, that such knowledge carried some competitive advantage, or that its customers' needs could not be ascertained simply

13

by inquiry addressed to those customers themselves." ***DeSantis v. Wackenhut Corp.***, 793 S.W.2d 670, 684 (Tex. 1990). Additionally, it stated that the employer "failed to show that its pricing policies and bidding strategies were uniquely developed, or that information about its prices and bids could not, again, be obtained from the customers themselves." *See **id.***; *see also **Miner***, 383 F. Supp. 3d at 698. Therefore, without any evidence in this regard, along with its failure to rebut Pearce's evidence claiming that PetroChoice did not provide her any other confidential information and training, PetroChoice has not shown its entitlement to summary judgment.

In conclusion, on the record before us, Pearce failed to establish that the agreement was unenforceable as a matter of law. Moreover, PetroChoice neither conclusively negated an element of Pearce's claim nor established in its competing motion that the covenant was enforceable as a matter of law. The record as it is currently developed shows only that disputed or ambiguous facts remain concerning whether PetroChoice provided confidential information worthy of protection to Pearce that would render its otherwise illusory implied promise to provide confidential information enforceable. In other words, although the enforcement of the covenant is a question of law, we hold that the record is not sufficiently developed at this juncture for us to evaluate that matter as a question of law, because factual issues remain unresolved, and neither party met their summary judgment burden. *See **Roark***, 813 S.W.2d at 496; ***Gorman***, 2011 WL 1642624, at *8.

Finally, Pearce contends that the covenant was unreasonable as to its geographic scope. However, since we have held that factual issues remain regarding the threshold issue of whether the covenant was ancillary to an otherwise enforceable agreement, we need not examine this issue. *See* TEX. R. APP. P. 47.1; ***Fielding***, 289 S.W.3d at 849 (citing ***Light v. Centel Cellular Co. of Tex.***, 883 S.W.2d 642, 644 (Tex. 1994)) (noting that whether agreement is "ancillary to or part of an otherwise enforceable agreement" is threshold inquiry made prior to determining convenant's reasonableness as to time, geographical area, scope of activity to be restrained, and that it does not impose greater restraint than necessary to protect employer's goodwill or other business interest). Furthermore, even if Petro Choice satisfied its burden on this threshold issue, yet Pearce prevailed on her contention that the geographic territory covered by the covenant is unreasonable, it would not result in a disposition that the agreement is unenforceable. *See* TEX.

14

BUS. & COM. CODE ANN. § 15.51(c) (West 2011). Rather, the trial court would be required to reform the covenant and enforce it as reformed. *See id*.

PetroChoice's first issue is sustained insofar as the trial court erred in granting summary judgment in Pearce's favor because fact issues remain to be resolved.

## ATTORNEY'S FEES

PetroChoice contends in its second issue that the trial court erred in awarding attorney's fees to Pearce because the Covenant Not to Compete Act preempts her recovery of such fees under the circumstances presented in this case. *See* TEX. BUS. & COM. CODE ANN. §§ 15.51(c), 15.52 (West 2011). Because we have held that underlying fact issues remain concerning the enforceability of the covenant, and consequently reversed the trial court's summary judgment in Pearce's favor, we need not address this issue, as it is unripe for review. *See* TEX. R. APP. P. 47.1.

## SANCTIONS

In PetroChoice's third issue, it contends that the trial court abused its discretion in assessing sanctions in the amount of $18,231.67 against it.

### Standard of Review

We review a sanctions order for an abuse of discretion. ***Brewer v. Lennox Hearth Products, LLC***, 601 S.W.3d 704, 717 (Tex. 2020); ***Am. Flood Research, Inc. v. Jones***, 192 S.W.3d 581, 583 (Tex. 2006). A trial court abuses its discretion if it acts without reference to guiding rules and principles such that the ruling is arbitrary or unreasonable. ***Brewer***, 601 S.W.3d at 717; ***Jones***, 192 S.W.3d at 583. When reviewing a sanctions order, we are not bound by the trial court's fact findings or conclusions of law; instead, we must review the entire record independently to determine if the trial court abused its discretion. ***Brewer***, 601 S.W.3d at 717; ***Jones***, 192 S.W.3d at 583.

### Applicable Law

Chapter 10 of the Civil Practice and Remedies Code authorizes sanctions for filing a pleading or motion "for any improper purpose, including to harass or to cause unnecessary delay or needless increase in the cost of litigation." TEX. CIV. PRAC. & REM. CODE ANN. § 10.001(1) (West 2017). The sanction must be limited to what is sufficient to deter repetition of the conduct

15

and may include an order to pay to the other party the amount of the reasonable expenses incurred by the other party because of the filing of the pleading or motion, including reasonable attorney's fees. *Id.* § 10.004(b), (c)(3) (West 2017). The trial court shall describe in its sanctions order the conduct the court has determined violated Section 10.001 and explain the basis for the sanction imposed. *Id.* § 10.005 (West 2017).

A court also has the inherent power to impose sanctions for the bad faith abuse of the judicial process that may not be covered by rule or statute. *See In re Bennett*, 960 S.W.2d 35, 40 (Tex. 1997). This inherent power to impose sanctions may arise on the trial court's own motion in appropriate cases. *See id.* This inherent power includes sanctions imposed for interference with a court's traditional core functions, such as hearing evidence, deciding issues of fact raised by the pleadings, deciding questions of law, rendering final judgment, enforcing its judgment, managing its docket, and issuing and enforcing its orders. *Liles v. Contreras*, 547 S.W.3d 280, 290-91 (Tex. App.—San Antonio 2018, pet. denied). As part of this power, a court may also use its inherent power to impose sanctions for conduct that, if tolerated, "breeds disrespect for and threatens the integrity of our judicial system." *In re Bennett*, 960 S.W.2d at 40.

The Supreme Court recently emphasized that "[b]ecause inherent powers are shielded from direct democratic controls, and because of their very potency, inherent powers must be exercised with restraint, discretion, and great caution[,]" and to that end necessitates a finding of bad faith. *Brewer*, 601 S.W.3d at 718 (internal quotations and footnotes omitted). The inherent authority to sanction is also limited by due process, so such sanctions must be just and not excessive. *Id.* (citing *TransAmerican Nat. Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex. 1991)). First, in order for the sanction to be "just," a direct relationship must exist between the offensive conduct and the sanction imposed. *American Flood*, 192 S.W.3d at 583. This means that a just sanction must be directed against the abuse and toward remedying the prejudice caused the innocent party. *Id.* Second, sanctions must not be excessive, meaning that "the punishment should fit the crime." *TransAmerican*, 811 S.W.2d at 917. A sanction should be no more severe than necessary to satisfy its legitimate purposes. *Id.* It follows that courts must consider the availability of less stringent sanctions and whether such lesser sanctions would fully promote compliance. *Id.*

16

**Discussion**

After PetroChoice Holdings, LLC filed its answer and counterclaim to Pearce's Wood County suit, admitting that Wood County had proper venue, PetroChoice Holdings, Inc. filed its separate claim against Pearce in Wood County, also averring that Wood County was a place of proper venue concerning the enforceability and alleged breach of Pearce's employment agreement. Immediately after unsuccessfully seeking a TRO, PetroChoice Holdings, Inc. nonsuited its Wood County claim against Pearce and filed suit against Fleet Lube and Pearce in Collin County, Texas. After obtaining the TRO in Collin County that it unsuccessfully sought in Wood County, and after settling with Fleet Lube, PetroChoice Holdings, Inc. nonsuited the Collin County claim and filed its counterclaim to Pearce's original Wood County declaratory judgment action. All of these suits concern the same issue as it pertains to Pearce—the enforceability and breach of the noncompetition covenant in her employment agreement. The same attorneys represented both PetroChoice entities through this phase of these lawsuits.

Based on this perceived forum shopping, Pearce filed a motion for sanctions under Chapter 10 of the Texas Civil Practice and Remedies Code, alleging that this course of conduct was taken for an improper purpose, including to harass or to cause unnecessary delay or needlessly increase the cost of litigation. Pearce sought to recover its attorney's fees and hourly charges for paralegal services incurred in defending the Collin County action. After a hearing,[5] the trial court signed an order granting sanctions against PetroChoice, requiring it to pay Pearce $18,231.67. The trial court, in its order found as follows:

> The Court reviewed and considered the pleadings, motions, testimony and exhibits filed by the parties and arguments by counsel. The Court weighed the credibility of the evidence presented giving [consideration to the] assertions and defenses of the parties. The parties to the original contract were aware that venue was proper in Wood County, Texas. The Court is of the opinion that despite venue was agreed and made an integral part of the contract, Defendant employed legal tactics that placed extreme financial hardship on Plaintiff by naming her as a party in a lawsuit in Collin County, Texas. It is the opinion of the Court that the procedural maneuvering by Defendant in filing a non-suit against Plaintiff in Wood County, naming her as a party in Collin County, and filing suit against her again in Wood County, was an abuse of the judicial process designed and employed in an attempt to place Plaintiff in a financial stranglehold in hopes that she would eventually become financially unable to continue to pursue her remedies and continue litigation. As such, sanctions are imposed against Defendants in the amount of $18,231.67 to reimburse expenses incurred by Plaintiff.

---

[5] It is unclear whether the trial court conducted an oral hearing. Although the parties contend there was a hearing, the record contains no reporter's record. In any event, we recognize the trial court may base its sanctions assessment "on the papers filed and the arguments of counsel" without an oral hearing or the need for a reporter's record. *See **Otis Elevator Co. v. Parmelee***, 850 S.W.2d 179, 181 (Tex. 1993).

As PetroChoice points out, the Wood County trial court was without authority to impose sanctions under Chapter 10 for impermissible conduct occurring in the Collin County lawsuit. *See, e.g., **Mantri v. Bergman***, 153 S.W.3d 715, 718 (Tex. App.—Dallas 2005, pet. denied) (holding that only court with jurisdiction where allegedly frivolous litigation was pending had jurisdiction to impose sanctions under Chapter 10). Therefore, we may not affirm the sanctions order under Chapter 10. *See **id.***

However, the trial court retains inherent power to sanction the parties and attorneys in appropriate cases, even on its own motion. *See **In re Bennett***, 960 S.W.2d at 40. Even though Pearce's motion invokes only Chapter 10, the trial court's order granting sanctions is silent as to the basis upon which it assessed sanctions. Furthermore, it states that it was based on an "abuse of the judicial process," which is often recited as a basis for an inherent power-based sanctions order. Although the preferred practice is to explain the authority relied upon for assessing sanctions in the order, reviewing courts have examined whether the sanction order may be justified under the court's inherent authority when the order is silent. *See **Houtex Ready Mix Concrete & Materials v. Eagle Const. & Envtl. Services, L.P.***, 226 S.W.3d 514, 523–24 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

Moreover, sanctions ordered under the court's inherent authority are not necessarily limited to conduct occurring solely within the sanctioning court. *See **Howell v. Tex. Workers' Comp. Comm'n***, 143 S.W.3d 416, 447 (Tex. App.—Austin 2004, pet. denied) (concluding that a court may impose sanctions for conduct in another court pursuant to its inherent power to impose sanctions); *see also **Finlan v. Peavy***, 205 S.W.3d 647, 652-53 (Tex. App.—Waco 2006, no pet.) (where plaintiff filed action in Waco court consisting of counts severed from prior complaint already pending in Dallas district court and over which that court had asserted jurisdiction, Waco court had inherent power to dismiss action without prejudice in order to protect Dallas court's jurisdiction to adjudicate entire dispute pending before it).

Other courts have examined similar conduct to that in the instant case and upheld inherent power-based sanctions. *See, e.g., **In re Bennett***, 960 S.W.2d at 39-40 (upholding inherent power-based sanction for similar forum shopping conduct that was not sanctionable when viewed in a vacuum, such as filing suit and nonsuiting parties, but when viewed in entire course of litigation, showed bad faith abuse of judicial process and interference with traditional

core functions of court); *Liles*, 547 S.W.3d at 294–95 (upholding sanctions based on otherwise permissible conduct in another court that is part of overall litigation between parties). Importantly, as recently explained by the Texas Supreme Court, such sanctions must be predicated on an express bad faith finding. *Brewer*, 601 S.W.3d at 718-19. The trial court's description of the conduct justifying sanctions here is tantamount to a bad faith finding.[6]

But as we have stated, inherent power-based sanctions must be just and not excessive. *See id.* at 718. Assuming without deciding that the trial court could have concluded that PetroChoice's forum shopping was such an abuse to warrant sanctions under its inherent authority, we conclude that the order fails to satisfy the required due process standards. In its order, the trial court imposed sanctions in the amount of $18,231.67 to reimburse expenses incurred by Pearce for defending the Collin County action, without any explanation as to how it arrived at that amount. Furthermore, Pearce's attorney, without supporting documentation, identified in his motion only $15,172.50 incurred in connection with the Collin County litigation.[7] Without any explanation showing the basis for its sanctions amount or any supporting basis in the record justifying the trial court's higher sanction in excess of Pearce's requested amount, we must conclude that the sanction is unjust and excessive, and we therefore cannot affirm the sanctions order. *See Low v. Henry*, 221 S.W.3d 609, 621–22 (Tex. 2007) (reversing $50,000 sanction where trial court did not identify basis for imposing that sanction amount); *State Office of Risk Mgmt. v. Foutz*, 279 S.W.3d 826, 837–38 (Tex. App.—Eastland 2009, no pet.) (when sanction does not explain basis for calculating amount, it constitutes an impermissible arbitrary fine); *IFC Credit Corp. v. Specialty Optical Sys., Inc.*, 252 S.W.3d 761, 772–73 (Tex. App.—Dallas 2008, pet. denied) (reversing inherent power-based sanction for attorney fee sanction in amount unsupported by evidence and unexplained by trial court, holding

---

[6] Bad faith in the sanctions context is not just intentional conduct but intent to engage in conduct for an impermissible reason, willful noncompliance, or willful ignorance of the facts. *Brewer v. Lennox Hearth Products, LLC*, 601 S.W.3d 704, 718. (Tex. 2020) (internal citations omitted). It includes "conscious doing of a wrong for a dishonest, discriminatory, or malicious purpose." *Id.* Improper motive, not perfection, is the touchstone. *Id.* at 719. The trial court found in its order that PetroChoice's legal tactics were an "abuse of the judicial process designed and employed in an attempt to place [Pearce] in a financial stranglehold in hopes that she would eventually become financially unable to continue to pursue her remedies and continue litigation." This finding is tantamount to bad faith.

[7] Pearce's attorney alleged that his firm incurred $9,990.00 in attorney's fees and $5,182.50 for paralegal services in his motion, but did not provide evidence of billing records or other documentation explaining the basis for this amount of charges.

that "we are unable to determine a relationship between the sanction, the conduct, and the abuse sought to be remedied").

PetroChoice's third issue is sustained.

## DISPOSITION

Having determined that neither party met their summary judgment burden, that unresolved fact issues remain, and that the trial court's order granting sanctions against PetroChoice contained reversible error, we *reverse* the trial court's judgment in Pearce's favor and *remand* for further proceedings consistent with this opinion.

JAMES T. WORTHEN
Chief Justice

Opinion delivered January 13, 2021.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**JANUARY 13, 2021**

**NO. 12-20-00106-CV**

**PETROCHOICE HOLDINGS, LLC**
**& PETROCHOICE HOLDINGS, INC.,**
Appellants
V.
**MARY PEARCE,**
Appellee

Appeal from the 402nd District Court
of Wood County, Texas (Tr.Ct.No. 2018-611)

THIS CAUSE came to be heard on the oral arguments, appellate record and briefs filed herein, and the same being considered, because it is the opinion of this Court that there was error in judgment of the court below, it is ORDERED, ADJUDGED and DECREED by this Court that the judgment be **reversed** and the cause **remanded** to the trial court for further proceedings in accordance with the opinion of this Court; and that this decision be certified to the court below for observance.

James T. Worthen, Chief Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*